UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WILLIAM BROWN, | ) No. 1:12-cv-00394-SEB-DKL |
| RACHEL WIGGINS, | ) |
| INSTANT TAX REFUND SERVICE, | ) |
| DAVID FRANKLIN, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

This cause is before this Court on a Motion to Stay Proceedings [Docket No. 30] and a Motion to Dismiss for Failure to State a Claim [Docket No. 33] filed by Defendants David Franklin, Rachel Wiggins, and Instant Tax Refund Service. For the reasons detailed herein, Defendants' motions are <u>DENIED</u>.[1]

**Factual Background[2]**

Defendant Franklin owned and operated several Instant Tax Refund Service tax preparation stores in Indianapolis that conducted business under the name Instant Tax Service

---

[1] Since the briefing of these motions has closed, there have been a few significant developments in the case that should be noted. First, Plaintiff United States (the "Government") filed a motion for preliminary injunction in December 2012. The Court set the matter for a hearing in January 2013 but on the eve of that hearing, Defendant Franklin sold Instant Tax Refund Service, his franchise, to its franchisor, ITS Financial, which is subject to a preliminary injunction issued in a separate lawsuit brought by the Government in the Southern District of Ohio. At the hearing, the parties came to an agreement as to terms of a preliminary injunction against Defendants Franklin and Instant Tax Refund Service. Shortly thereafter, the parties submitted an agreed upon preliminary injunction order and the Court duly entered it. [Docket No. 79]. Stipulated orders for permanent injunctions were also entered against Defendants Rachel Wiggins and William Brown. [Docket Nos. 76, 80].

[2] The following factual recitation is based upon the Amended Complaint for Injunction [Docket No. 20] filed in April 2012. We note that the factual circumstances since the time that these allegations were made have changed substantially.

("ITS"). ITS is a brand marketed throughout the United States by a national franchisor, ITS Financial, LLC. Franklin operated 9 stand-alone ITS offices and 13 tax preparation kiosks. He was the sole shareholder of the franchise, which prepared over 10,000 tax returns in 2010 and 2011 combined.

Defendant Brown was a manager at one of the ITS stores. The Government alleged that Brown personally prepared false and fraudulent income tax returns and, under Franklin's direction, trained other employees to do the same.

Defendant Wiggins was the Chief Financial Officer of the ITS franchise. The Government alleges that Wiggins supervised ITS managers and tax preparers and, under Franklin's direction, taught new employees how to prepare fraudulent tax returns.

The Government's Amended Complaint alleged that the ITS franchise maintained a business environment that promoted and encouraged the preparation of false and fraudulent tax returns for the purpose of enlarging its own profits. ITS allegedly preyed on its customer base, largely made up of "unsophisticated taxpayers with very low incomes," by promising these individuals thousands of dollars of illegal refunds. The Government alleged that while some customers were complicit in Defendants' fraud, others had no knowledge that the returns prepared on their behalf are fraudulent. The Government alleged that ITS charged these customers unconscionably high tax preparation and added fees, averaging more than $400-$500, for as little as 15 minutes of return preparation. ITS also allegedly offered these customers false and deceptive loan products that principally served as an inducement for ITS to prepare the customers' tax returns.

ITS made its employees complicit in its fraud by intentionally recruiting individuals with little or no tax preparation or experience and then training these employees while encouraging

the fraudulent practices discussed in more detail below. ITS also allegedly linked its employees' compensation to the fees that it charges its customers, meaning that employees were rewarded for charging customers higher fees. Specifically, employees' hourly wages doubled if they prepared and successfully filed a certain number of tax returns with the IRS. However, the employee would only "get credit" for the return if ITS's "average fee" was charged. Lesser fees meant that the employee was given partial credit for the return, while higher than average fees meant that the employee could earn credit for more than one return. This incented the employees to charge customers higher fees and to inflate their customers' tax refunds in the first place.

The Government alleged that Defendants operated illegally in the following respects: (1) engaging in a practice called "paystub filing" and fabricating W-2 forms and otherwise lying to Internal Revenue Service ("IRS") agents in order to hide the practice; (2) luring unsuspecting customers by offering deceptive and misleading loan products and then charging customers unconscionable fees; and (3) engaging in fraudulent tax return preparation in order to inflate their customers tax refunds (and, consequently, their own fees) and trafficking EIN numbers. We explain each of these practices in more detail below.

### Paystub Filing

The IRS prohibits tax return preparers from filing a return based on a taxpayer's last paycheck stub, as opposed to a an official W2 form, issued by the taxpayer's employer. This practice is referred to as "paystub filing" and is forbidden by the IRS because it inevitably leads to calculation errors and other incorrect or unreliable information. The Government alleges that Defendants routinely engaged in paystub filing despite the prohibition against the practice.

In 2009, an IRS investigating agent discovered numerous violations of the IRS's prohibition of paystub filing by ITS. Franklin's response was to promise the agent that he would

instruct his employees to stop the practice. However, according to Plaintiff's Complaint, Franklin's promise was illusory because he had no intention of ending the practice, since it gave ITS a competitive advantage over other tax preparers.[3] Indeed, in a three week employee training session beginning during the last week of November 2010, Franklin, Wiggins, and Brown all allegedly taught and instructed approximately 30 prospective employees the procedures for paystub filing and the way to create fictitious W-2s utilizing Drake tax preparation software. Am. Compl. ¶ 26. Phony W-2s were placed in customers' case files to cover up the fact that ITS had continued to engage in paystub filing, in the event of future IRS audits. Id. ¶ 32.

During a subsequent visit from an IRS agent in March 2010, Defendants Franklin and Brown were questioned about numerous, identical W-2's found in the files. Franklin and Brown lied to the agent, telling him/her that the W-2's looked identical only because they were obtained from the same source. In actuality, the W-2's were fabricated by ITS employees using Drake tax preparation software. Compl. ¶ 34.

In January 2011, Franklin conducted employee training via the internet during which he once again encouraged the employees to continue the practice of creating phony W-2's from the tax preparation software and the taxpayer-customer's paystubs. Compl. ¶ 33.

**False and Deceptive Loan Products**

The Government alleged that ITS offered false and misleading loan products to lure customers into having ITS prepare their tax returns. Specifically, Defendants allegedly offered small, non-recourse loans called "Instant Cash Loans" intended to attract customers before the tax filing season began (December and early January). When the customer applied for the loan

---

[3] A taxpayer can file only one electronic return with the IRS per year. Thus, filing an early return for a customer based only on their paystub prevented the customer from seeking out the tax preparation services of ITS's competitors.

using his or her final paystub of the year, ITS employees also completed an "estimated" tax return that they filed for the customer without waiting for the requisite W-2 form. The Government alleged that ITS offered recourse loans that used the customer's expected tax refund as collateral, referred to as "Refund Anticipation Loans." RAL funds were given to the customer only after ITS prepared and filed the customer's tax return and that return was accepted by the IRS. The application for these loans listed Tax Tree, LLC as the loan provider and stated that Tax Tree "is not affiliated with the Tax Preparer." In actuality, however, the owner of franchisor ITS Financial is also the sole owner and CEO of Tax Tree. Tax Tree is allegedly undercapitalized and, thus, denies over 90% of the loan applications filled out by customers that ITS simply wants to get in the door. Customers were charged fees, whether their loan applications were denied or not, and those that did receive loans were for amounts so small that they were subsumed by fees charged by ITS and Tax Tree.

### **Fraudulently Inflating Customers' Tax Returns**

The Government alleged that Defendants instructed ITS employees to report phony businesses inflating income and expenses, to conduct lax due diligence when it came to determining whether ITS customers qualify for the Earned Income Tax Credit ("EITC"),[4] falsely claim education credits, fraudulently claim false filing statuses, and fraudulently omit income and file the tax return without the customer's consent. The Government alleged that ITS employees were instructed on how to engage in some of these practices during the 2010 end-of year training session referenced above. Am. Compl. ¶ 44. The inflation of ITS customers' tax refunds benefits the tax preparer because ITS rewards the preparer through its commission and bonus structure. Id. ¶ 45. The Amended Complaint contains several instances in which

---

[4] The EITC is a refundable tax credit intended to help low-income individuals and families.

Defendant Brown as well as other unidentified ITS employees have prepared such inflated tax returns for ITS customers. Am. Compl. ¶¶ 48-50; 52-53; 55-56; 68.

In 2009, following a EITC compliance visit, the IRS warned ITS for failing to conduct the due diligence required related to customers claiming the EITC. Notwithstanding these warnings, Defendants continued to instruct employees on ways to circumvent EITC due diligence requirements in 2010 and 2011. Am. Compl. ¶ 91.

The Government also alleged that Defendants instructed ITS employees to use incorrect EIN numbers. Compl. ¶ 37. EIN numbers are listed on official W-2 forms and identify the taxpayer's employer. The number is not located on taxpayers' paystubs, which is presumably one reason that paystub filing is prohibited. The Government alleged that Defendants saved a list of valid EIN numbers for use when engaging in paystub filing to ensure that the tax return was not immediately rejected by the IRS.

## Legal Analysis

As noted above, this cause is before the Court on Defendants' Motion for a Stay of Proceedings and Defendants' Motion to Dismiss or For a More Definite Statement. We discuss the merits of each of these motions below.

### I. Defendants' Motion for a Stay of Proceedings

Defendants request a stay of these civil proceedings until the threat of criminal prosecution for the matters giving rise to Plaintiff's Amended Complaint no longer exists for Defendants. They maintain that with the possibility of criminal investigations pending against them, allowing the civil litigation to continue puts Defendants in the position of having to waive their Fifth Amendment rights or invoke those rights by declining to participate in the civil

litigation, thereby inviting a default judgment against them.[5] Plaintiff opposes Defendants' request.

As both parties acknowledge, the Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings. Jones v. City of Indianapolis, 216 F.R.D. 440, 450 (S.D. Ind. 2003). However, district courts have discretion to stay civil proceedings in such situations. See, United States v. 6250 Ledge Rd., 943 F.2d 721, 729 n. 9 (7th Cir. 1991). "The ultimate question, therefore, is 'whether the court should exercise its discretion in order to avoid placing the defendants in the position of having to choose between risking a loss in their civil cases by invoking their Fifth Amendment rights, or risking conviction in their criminal cases by waiving their Fifth Amendment rights and testifying in the civil proceedings.'" Jones, 216 F.R.D. at 451 (quoting Cruz v. County of Dupage, 1997 U.S. Dist. LEXIS 9220, 1997 WL 370194, *1 (N.D. Ill. 1997)).

District courts consider a variety of factors in determining whether a stay pending criminal proceedings is warranted, including: (1) the posture of the criminal proceedings; (2) the overlap of the criminal and civil proceedings; (3) whether the government entity initiating the criminal action is also a party in the civil matter; (4) the burden on the defendants if the civil case is not stayed; (5) the prejudice to the civil plaintiff if the civil case is stayed; and (6) the effect of a stay on the public interest. PNC Bank v. Pence, 2009 U.S. Dist. LEXIS 1883 (S.D. Ind. Jan. 12, 2009) (citing Hollinger Int'l, Inc. v. Hollinger Inc., No. 04 C 698, 2008 U.S. Dist. LEXIS 3289, at *7 (N.D. Ill. Jan. 16, 2008)). As discussed below, we decline to grant a stay of the instant litigation after considering these factors.

---

[5] The Fifth Amendment provides a privilege against compulsory self-incrimination. Kastigar v. United States, 406 U.S. 441, 444-45 (1972). "It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Id.

First, no indictment has been issued against any of the Defendants.  Indeed, while Plaintiff acknowledges that Defendants' fears that the serious allegations against them might be criminally investigated are not unreasonable, the Government has not indicated or confirmed that a criminal investigation into Defendants' activities has commenced.[6]  As a general rule, "pre-indictment requests for stay are denied." Pence, 2009 U.S. Dist. LEXIS 1883 at *2; see also Microfinancial, Inc. v. Premier Holidays Intern., Inc., 385 F.3d 72, 79 (1st Cir. 2004)("While pre-indictment stays of parallel civil proceedings occasionally have been granted, an unindicted defendant who argues that going forward with a civil proceeding will jeopardize his Fifth Amendment rights usually presents a much less robust case for such extraordinary relief . . . . [T]he case is weakened further [if] defendants' motion papers d[o] not inform the court of when the investigation started, how long it was expected to last, or any other facts that might tend to suggest that an indictment was more than a remote possibility.").  Thus, the lack of an indictment means that the first factor (the posture of the criminal proceedings) weighs against our imposing a stay.  That said, the lack of an indictment impedes the Court's ability to consider the second factor – the extent to which the criminal and civil proceedings overlap.  Without an indictment, we have no basis on which to determine the extent to which the current civil proceedings and a possible future criminal proceedings might overlap.  Thus, the potential overlap factor is neutral in terms of whether to impose a stay of these proceedings.

Defendants argue that the fourth factor (their burden in the absence of a stay) is severe.  We think Defendants' point is well-taken, assuming that criminal proceedings against them are actually undertaken at some point.  The Seventh Circuit as well as many district courts have acknowledged the perilous position of defendants who are subject to both civil and criminal

---

[6] Apparently, it is the Government's general policy not to disclose in civil tax injunction cases whether or not a civil defendant is under criminal investigation or may be in the future.

proceedings.  See, e.g., 6250 Ledge Rd., 943 F.2d at 729 (quoting United States v. Little Al, 712 F.2d 133, 136 (5th Cir. 1983)); Hollinger Int'l, Inc. v. Hollinger, Inc., No. 04 C 698, 2008 U.S. Dist. LEXIS 3289, at *11 (N.D. Ill. Jan. 16, 2008)("Proceeding with discovery would force the Defendants into the uncomfortable position of having to choose between waiving their Fifth Amendment privilege or effectively forfeiting the civil suit.  If the Defendants invoke their constitutional privilege during civil discovery, not only does this prevent them from defending their position, it may subject them to an adverse inference from their refusal to testify."); Pence, 2009 U.S. Dist. LEXIS 1883, at *4 ("In essence, [Defendants'] choice is to testify in the civil matter at their peril in the criminal matter or, "plead the Fifth" and face resolution of the civil matter against them because they cannot form a defense.").  We acknowledge the difficulties imposed by the threat of parallel civil and criminal proceedings on Defendants and, thus, conclude, therefore, that this factor does weigh in favor of granting Defendants' request for a stay.

     Regarding the prejudice to the Government and the effect of a stay on the public interest, Defendants argue that this factor also weighs in favor of a stay because the remedy that the Government seeks would put Defendants' non-party employees out of work.  However, Defendants' argument addresses the way members of the public might be burdened by Plaintiff's requested relief, not by the denial of their request for a stay.  The Government argues that this factor weighs against the issuance of a stay because a stay would impede its effort to protect low-income taxpayers from Defendants' fraudulent practices and to prevent the U.S. Treasury from wrongfully losing tax revenue.  Because criminal proceedings have not even commenced against these Defendants, it is impossible to predict how long such an impediment might be in place, i.e. how long it will be until Defendants are no longer confronting the possibility of criminal charges

against them.  We agree that, if the Government's allegations are indeed true, these taxpayers and the U.S. Treasury should not have to await the resolution of a criminal prosecution that may or may not ensue to be free from Defendants' fraudulent activities.  Thus, we hold that these final two factors weigh against the imposition of a stay.[7]

In sum, the only factors weighing in favor of a stay of this litigation are that the Government would be the initiating party in both this and any criminal proceedings that might ensue and the burden on Defendants of having to choose how to participate in this civil litigation without waiving their Fifth Amendment rights from self-incrimination.  The Seventh Circuit and various district courts have acknowledged that "it is not unconstitutional to put a defendant to such a choice."  Pence, 2009 U.S. Dist. LEXIS 1883, at *4; see also 6250 Ledge Rd., 943 F.2d at 729, n.9.  Accordingly, a stay of these proceedings pending the outcome of criminal proceedings is at best premature and Defendants' request must be denied.

## II.     Defendants' Motion to Dismiss

Defendants have also filed a motion to dismiss arguing that Plaintiff's Amended Complaint fails to satisfy Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake."[8]  Fed. R. Civ. P. 9(b).  The reason for this heightened pleading standard is to prevent plaintiffs from charging a defendant with fraud irresponsibly.  See Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999).  A plaintiff "claiming fraud . . . must do more pre-complaint investigation to

---

[7] Defendants also contend that the absence of a stay will require the Court to "micromanage" the parties' discovery because Defendants will be concerned at every stage of discovery as to whether their cooperation will be held against them.  While we appreciate Defendants' concern for the Court's time and urge the parties to consider the impact on judicial resources before bringing motions to compel or motions for protective orders, we do not find that this consideration warrants a stay of the civil proceedings.

[8] We agree with Defendants that Rule 9(b)'s heightened pleading standard applies to the Government's Amended Complaint.  "A claim that 'sounds in fraud' -- in other words, one that is premised upon a course of fraudulent conduct -- can implicate Rule 9(b)'s heightened pleading requirements." Borsellino, 477 F.3d at 507.  The Government's allegations that Defendants "illegally prepare false and fraudulent federal income tax returns" clearly "sound in fraud."

assure that the claim is responsible and supported, rather than defamatory and extortionate.' . . . A complaint alleging fraud must provide . . . 'the who, what, when, where, and how.'" Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502 (7th Cir. 2007) (quoting Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)). Still, absolute particularity is not required, see Mut. Life Ins. Co. v. Krejci, 123 F.2d 594 (7th Cir. 1941), and in considering the motion to dismiss, the court still construes all inferences in the light most favorable to the non-movant. See Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003).

Defendants' primary argument is that the Amended Complaint's allegations impermissibly refer to "Defendants" as a group, without specifically identifying fraudulent acts taken by each individual Defendant. "Under Rule 9(b), a claimant must make specific and separate allegations against each defendant; '[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient.'" Winforge, Inc. v. Coachmen Indus., 2007 U.S. Dist. LEXIS 18360, at *16 (S.D. Ind. March 13, 2007) (quoting Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990)).

Whether the Amended Complaint often refers to "Defendants" as a group or not, we disagree with Defendants' assertion that that fact that means the pleading must be dismissed or that Plaintiff must file a more definite statement. While Plaintiff's Complaint clearly does include some allegations against "Defendants," considering the Complaint as a whole we find that it provides adequate detail to satisfy the requirements of Rule 9(b). United States ex rel. Robinson v. Northrop Corp., 824 F. Supp. 830, 832-33 (N.D. Ill. 1993). The Complaint explains how each of the Defendants was associated with ITS and with each other, and alleges facts detailing each Defendant's personal involvement in the alleged fraudulent activity. These allegations are not lacking in detail regarding "the who, what, when, where, and how" of

Plaintiff's allegations of fraudulent activity. For instance, Paragraph 25 expressly alleges that "Franklin -- assisted by Wiggins and Brown -- taught employees how to prepare and file federal tax returns using customers' end-of-year paystubs" and "how to use those paystubs, along with a program in the Drake tax preparation software, to create fictitious W-2s." Compl. ¶ 25. That paragraph further specifies that this activity occurred at a training session beginning the last week of 2010 "at a facility near the intersection of 12th Street and Ritter." Id. Paragraph 31 also illustrates the type of detailed allegations in the Complaint against Franklin, the only individual Defendant who has not stipulated to a permanent injunction in this case, explaining that an IRS agent confronted Franklin after a compliance visit in 2009 during which numerous instances of "paystub filing" were discovered. The Complaint further alleges that Franklin misrepresented to the IRS agent that he would instruct his employees to stop the practice but that he had no intention of doing so and, indeed, instructed his employees to continue to engage in paystub filing at the training session referenced above. Compl. ¶ 31-32; see also Compl. ¶ 33 (alleging that "Franklin personally conducted additional employee training via the internet in the first week of January 2011, during which he encouraged employees to continue fabricating W-2s using the Drake software and customers' paystubs."). Such detailed allegations, provide Defendants sufficient notice of the fraudulent activities alleged against them to satisfy the Rule 9(b) requirements.

Defendants point to several specific paragraphs that lump "Defendants" activities together. To the extent that this is true, these "summary" paragraphs do not negate or obfuscate the more specific allegations regarding each Defendant or otherwise pose an unfairness to Defendants. By way of example, Paragraph 14 of the Complaint provides:

> Defendants, and others acting with them, have created and maintain a business environment at Franklin's Instant Tax Service franchise that expressly promotes

>and encourages the preparation of false and fraudulent federal income tax returns. Defendants train new Instant Tax Service employees to prepare false and fraudulent tax returns for the purpose of significantly and illegally enlarging Instant Tax Service's profits. Defendants also direct employees to engage in other illegal conduct, such as the preparation of fabricated Forms W-2.

Compl. ¶ 14.  Importantly, in the paragraphs preceding Paragraph 14, the Complaint specifically accuses each Defendant of participation in the fraud.  Compl. ¶ 4 (alleging that Franklin "directs, supervises and manages dozens of tax return preparers who illegally prepare false and fraudulent federal income tax returns at his numerous Instant Tax Service locations" and providing examples of the alleged illegal activities); ¶ 6 (alleging that "Brown personally prepares false and fraudulent federal income tax returns, and helps Franklin train new employees to prepare fraudulent tax returns."); ¶ 7 (alleging that "Wiggins also assists Franklin in supervising Instant Tax Service managers and tax preparers, and helps Franklin teach new employees how to prepare fraudulent tax returns.").  Likewise, Paragraph 26 of the Complaint recites:

> Following the creation of the fabricated W-2s, defendants told the trainees to cut off the small-print on the W-2 stating that it was not an original W-2, but rather was made using the Drake software. Defendants also directed trainees to put the forged W-2 in the customer's case file, and the end-of-year paystub (used to prepare the return and bogus W-2) in a separate, undisclosed file to prevent the IRS from detecting the fraud.

Compl. ¶ 26.  Again, as discussed above, the preceding Paragraph 25 provides significant details that put that paragraph into context.   Compl. ¶ 25.

Defendants also take issue with the fact that Plaintiff's Complaint does not disclose the specific taxpayer-customer(s) involved in their various schemes.  For instance, several paragraphs reference unidentified employees at Franklin's various ITS locations and the preparation of fraudulent tax returns for customers identified only as "Customers 1-7."  This lack of information is of no moment' while identifying victims of or individuals otherwise involved with Defendants' allegedly illegal activities could be one method of providing defendants with

notice of the fraudulent allegations against them, Defendants have provided no authority requiring such identification where the allegations already clearly provide adequate notice to them.

Having satisfied ourselves that the detailed allegations contained in Plaintiff's Complaint are quire sufficient so as not to run afoul of Rule 9(b)'s heightened pleading requirements for claims of fraud, Defendants' Motion to Dismiss or, In the Alternative, for a More Definite Statement Pursuant to Rule 12(e) is denied.

## Conclusion

For the reasons detailed herein, Defendants' Motion for a Stay and their Motion to Dismiss are <u>DENIED</u>.

IT IS SO ORDERED.

Date: 03/25/2013

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Julie A. Camden
CAMDEN & MERIDEW, P.C.
jc@camlawyers.com

Joshua Thornton Robertson
COHEN GARELICK & GLAZIER
jrobertson@cgglawfirm.com

James P. Madigan
GREENBERG TRAURIG LLP
madiganj@gtlaw.com

Thomas D. Sykes
GREENBERG TRAURIG LLP
sykest@gtlaw.com

Lauren Phyllis Buford
GREENBERG TRAURIG, LLP
bufordl@gtlaw.com

Jose Apolinar Olivera
U.S. DEPARTMENT OF JUSTICE
jose.a.olivera@usdoj.gov

Russell J. Edelstein
U.S. DEPARTMENT OF JUSTICE-Ben Franklin
russell.j.edelstein@usdoj.gov

Sean M. Green
U.S. DEPARTMENT OF JUSTICE-Ben Franklin
sean.m.green@usdoj.gov

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Nathan E. Clukey
US DEPARTMENT OF JUSTICE
nathan.e.clukey@usdoj.gov